**In re Grace ABOODY, Debtor.**

**No. 96–46338 JFQ.**

United States Bankruptcy Court,
D. Massachusetts.

June 20, 2000.

**DECISION**

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

The final, cataclysmic reverberation from a failed business is often a claim of the Internal Revenue Service against a corporate officer for unpaid "trust fund" taxes. So it is here. Where, as here, the claim is not against the recognized leader of the enterprise, case law has in the past been too vague to offer much guidance. Fortunately, however, a recent First Circuit decision sheds sufficient light to resolve this claim.

Grace Aboody (the "Debtor") was treasurer of El Morocco, Inc. (the "Corporation"), the operator of a restaurant which was a local landmark. She initiated the present chapter 13 proceeding when the I.R.S. sought to enforce its lien through the sale of her home. The I.R.S. promptly filed a claim with this court, to which the Debtor has objected. It is a secured claim in the sum of $100,116.09. The Debtor does not dispute the amount. Indeed, this amount, less interest, is what was reported by the Corporation as its debt for payroll taxes on returns which it filed without payment for the last three quarters of 1991. The Debtor contends her brother Joseph Aboody, who was the Corporation's president, is the sole "responsible person" with respect to payment of these taxes.[1] I set forth here my findings of fact and conclusions of law following trial. The parties have stipulated to many of the facts.

## I. *FACTS*

Paul and Helen Aboody, the parents of the Debtor and Joseph, opened the El Morocco restaurant many years ago in the first floor and basement of a "three decker" home on Wall Street in Worcester, Massachusetts. All eight of their children worked in the restaurant. In 1977 the restaurant moved to new and grander quarters across the street. At about that time Joseph replaced his father as president. The Debtor served as treasurer.

---

1. The I.R.S. has previously made claims against Joseph, but apparently encountered a dry hole.

The Corporation's outstanding shares were evenly divided among the eight children, so that each held a 12.5% stock interest. The Debtor and Joseph served as directors. It is unclear from the evidence whether other siblings served on the board.

Joseph Aboody was the acknowledged "boss." He oversaw all of the restaurant's operations, including hiring or firing employees, purchasing food and supplies, dealing with suppliers and customers, payment of debts, placing advertising, making arrangements for special functions such as weddings, and booking entertainment in the lounge. Six of the siblings (Paul Jr., John, Richard, Adell, Marian and Nathie) served as chefs. Richard also had oversight responsibilities in the lounge and, with Joseph, booked entertainment.

The Debtor had various duties. She was the "overseer" of bookkeeping; she interacted between Joseph and the dining room hostesses; and with Joseph she worked on special functions held in the restaurant's banquet room. She was the one who hired bookkeepers. During her tenure she fired but one person, a cashier who was caught dipping into the till. The Debtor neither made, nor participated in, any major management decisions. Throughout the history of the restaurant's operation only the male members of the Aboody family had any significant input into major management decisions. Upon becoming president, Joseph was the one who always made the final decision.

During 1991, and for some time before, the Corporation maintained with Commerce Bank & Trust Co. a checking account for the payment of all bills, including taxes. The Debtor and Joseph, signing singly, were the authorized signatories. The Debtor signed most of the checks drawn on this account. Joseph signed some. Although apparently not an authorized signatory, the Debtor's sister Nathie also signed a few checks.

The Corporation's quarterly returns for employment taxes, on Form 941, were pre-pared by two employees working in the bookkeeping department, Donald Doyle and Kathleen Ghiz. These returns were signed by either the Debtor or Joseph, or by Ms. Ghiz in the name of the Debtor or Joseph and initialed by Ms. Ghiz. In 1989 or 1990 the Corporation began experiencing serious financial difficulties, caused at least in part by employee pilfering. Some suppliers put it on a C.O.D. basis. Others refused to deal with it at all, which required frequent changes of suppliers. Due to lack of funds, the Corporation failed to make the required periodic deposits for employment taxes during the second calendar quarter of 1991. Despite the urging of the Debtor, Joseph refused to permit these deposits. The Corporation still did not have the money for their payment in July when the return for that quarter had to be filed. With Joseph's permission, Ms. Ghiz prepared the second quarter's return, signed Joseph's name to it, and filed it without payment. She did the same as to the returns for the next two calendar quarters.

The Debtor pleaded with Joseph to pay the taxes. He refused. He told her he had to use funds on hand to keep the restaurant going, and that the taxes would eventually be paid. He permitted her to write only those checks which he approved. Indeed, that had been going on for some years. Whenever Ms. Ghiz would ask the Debtor for permission to draw a check to pay a bill, the Debtor would first have to get Joseph's permission, unless the bill was for food or supplies which had already been delivered C.O.D. This restriction upon the Debtor's authority was approved by the other stockholders. Beginning at least in July of 1991, the Debtor frequently told Joseph and the others that she wanted to resign as treasurer because she had no authority to make decisions on finances. Her siblings asked her to stay on, saying they wanted everyone to stick together as a family through the financial crisis. The

Debtor relented and stayed for the time being.

Matters grew worse in early 1992. The Debtor was unable to stand the strain. She resigned as treasurer in March of 1992, being replaced by Joseph.

■ A word of explanation about the burden of proof and its effect upon the foregoing findings. The Debtor assumes that she has the burden of proof on the responsible person issue. She would indeed have the initial burden of proof in a suit outside of bankruptcy seeking a refund of taxes paid. *See United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *United States v. Anderson*, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347 (1926); *Webb v. I.R.S.*, 15 F.3d 203 (1st Cir.1994). A recent Supreme Court decision tells that the burden of proof concerning a contested claim in bankruptcy is borne by the same party who would bear the burden if the contest took place outside of bankruptcy. *See Raleigh v. Illinois Dept. of Revenue*, —— U.S. ——, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000). However, the burden in a refund suit rests with the government when a taxpayer introduces credible evidence on any relevant issue, provided the taxpayer has maintained required records and has cooperated with the government. 26 U.S.C.S. § 7491(a) (Law.Co-op.1999). There is no contention here of lack of record keeping or cooperation. Because of the Debtor's concession, however, I treat the burden as being borne by the Debtor throughout the trial, and make my findings accordingly.

## II. *DEBTOR AS A "RESPONSIBLE PERSON"*

The Internal Revenue Code imposes tax liability upon "[a]ny person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax . . . ." 26 U.S.C.S. § 6672(a) (Law.Co-op.1999). The term "person" is defined for purposes of section 6672(a) to include "an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs." 11 U.S.C.S. § 6671(b) (Law.Co-op.1999); *see also Slodov v. United States*, 436 U.S. 238, 245, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978). The decisions, with some lack of precision, usually use the shorthand expression "responsible person" when referring to the "person required to collect, truthfully account for, and pay over any tax imposed by this title," as that phrase appears in section 6672(a). *See Slodov*, 436 U.S. at 245–246, 98 S.Ct. 1778 (commenting upon shorthand statutory reference and using phrase without necessarily adopting its construction in decisions).

■ Using the same shorthand, the question here is whether the Debtor is a responsible person. There is no issue concerning the second statutory requirement for liability—willfulness. The Debtor concedes that her knowledge of the Corporation's failure to pay the taxes is sufficient to make the nonpayment willful so as to impose liability upon her if she is deemed a responsible person. That concession is consistent with case law. *See, e.g., Vinick v. Commissioner*, 110 F.3d 168, 173–74 (1st Cir.1997) (equating knowledge to willfulness for purpose of section 6672(a) after concluding that responsible person determination involved factual question) (*"Vinick I "*).

In this circuit, as in others, the decisions usually focus on the nonstatutory phrase "responsible person," rather than upon the more precise definition of "person" contained in section 6671(a). *See, e.g., Caterino v. United States*, 794 F.2d 1, 5–6 (1st Cir.1986), *cert. denied*, 480 U.S. 905, 107 S.Ct. 1347, 94 L.Ed.2d 518 (1987). The decisions look to whether the person in question "had the power to determine whether the taxes should be remitted or paid or had 'the final word as to what bills

should or should not be paid'." *Caterino,* 794 F.2d at 5 (quoting *Adams v. United States,* 504 F.2d 73, 75 (7th Cir.1974)), *cert. denied,* 421 U.S. 991, 95 S.Ct. 1998, 44 L.Ed.2d 482 (1975)).

Determining who had the "final word" on payment of taxes is fairly simple, particularly in this case. Unfortunately, the decisions also employ broad language in resolving responsible person questions, thereby fashioning a less useful standard. It is said that " '[r]esponsibility is a "matter of status, duty and authority...." ' " *Thomsen v. United States,* 887 F.2d 12, 16 (1st Cir.1989) (quoting *George v. United States,* 819 F.2d 1008, 1011 (11th Cir.1987) (quoting *Mazo v. United States,* 591 F.2d 1151, 1156 (5th Cir.), *cert. denied,* 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979))). Further complicating the standard, this circuit and others adopt a multi-factor approach, looking to matters such as the holding of corporate office, control over financial affairs, authority to disburse corporate funds, stock ownership, and the ability to hire and fire employees. *See Thomsen,* 887 F.2d at 16; *George,* 819 F.2d at 1011.

Although adopting a multi-factor standard, the First Circuit recently narrowed the focus of the inquiry quite significantly in *Vinick v. United States,* 205 F.3d 1 (1st Cir.2000) (*"Vinick II"*). The taxpayer, a C.P.A., was a 50% owner of a company operating a foundry. He held the title of treasurer. The other 50% owner, a lawyer by profession, was the company's full-time president during the period in question. Both were authorized signatories on the company's checking account, although the taxpayer never signed checks until the company filed under Chapter 11 after the calendar quarters in question. The president's wife was office manager and bookkeeper. The taxpayer, while maintaining his accounting practice, would periodically visit the company's premises to collect financial information for the quarterly em-

ployment tax returns. He prepared the returns and left them with the president to sign and make payment on, reminding the president of the importance of paying withholding taxes.[2] The president signed and filed these quarterly returns but failed to make the payments shown to be due on five of them. The I.R.S. assessed the taxpayer for the unpaid taxes, whereupon he made a partial payment and sued for a refund. The I.R.S. counterclaimed for the unpaid balance. The district court ruled that he and the company's president were both responsible persons, and the taxpayer appealed.

The First Circuit in *Vinick II* began its analysis by setting forth a seven-part test for determining whether a party is a responsible person. The test involves whether the taxpayer

(1) is an officer or member of the board of directors,

(2) owns shares or possesses an entrepreneurial stake in the company,

(3) is active in the management of day-to-day affairs of the company,

(4) has the ability to hire and fire employees,

(5) makes decisions regarding which, when and in what order outstanding debts or taxes will be paid,

(6) exercises control over daily bank accounts and disbursement records, and

(7) has check-signing authority.

*Vinick II,* 205 F.3d at 7.

Although noting that "[n]o single factor is determinative of responsibility ...," 205 F.3d at 8, the *Vinick II* court said:

Because the goal of the statute is to hold liable for the nonpayment of withholding taxes the party responsible for such payment, the "crucial inquiry is whether the person had the 'effective power' to pay taxes—that is, whether he had the actual authority or ability, in view of his

2. The company had previously fallen behind in paying of employment taxes and had com-
pleted a payment plan which the taxpayer had negotiated with the I.R.S.

status within the corporation, to pay the taxes owed." (quoting *Barnett v. I.R.S.,* 988 F.2d 1449, 1454 (5th Cir.), *cert. denied,* 510 U.S. 990, 114 S.Ct. 546, 126 L.Ed.2d 448 (1993)). *Id.*

 The court then focused upon the final three factors (numbers 5, 6, and 7) because they "assess involvement in the financial operations of the corporation." 205 F.3d at 9. "This inquiry," the court said, "is the heart of the matter because it identifies most readily the person who could have paid the taxes, but chose not to do so." *Id.* The court then went on to say:

> Of the three factors within this central question [factors 5, 6 and 7], the first, whether the taxpayer has decision-making authority, is the most important because the goal of § 6672 is to fix liability on those persons who could have and should have remitted taxes to the IRS.

*Id.*

 The First Circuit in *Vinick II* therefore concluded that the taxpayer was not a responsible person. In the present case, the "most important" factor—who decides whether or not to pay the taxes—certainly indicates that Joseph and not the Debtor is a responsible person. Another "crucial" factor points only to Joseph—exercise of control over bank accounts and disbursement records (number 6). Some less "important" factors point in the same direction—management activity and ability to hire and fire employees (numbers 3 and 4). Because Joseph and the Debtor both were officers and shareholders, and both had check signing authority, only three of the seven factors indicate that the Debtor as well as Joseph is a responsible person. I conclude that Joseph and not the Debtor is a responsible person.

The government says that a superior officer's direction not to pay taxes does not relieve a party of responsible person status, citing *Roth v. United States,* 779 F.2d 1567 (11th Cir.1986). *Roth,* however, employed a standard different from that adopted in *Vinick II.* The court in *Roth* placed no particular importance upon who had the final word on payment of taxes. *See id.* at 1571. It instead stressed the concept of status, duty and authority to pay taxes. *See id.* It believed that authority flowed from the position held, regardless of the commands of a superior, and that authority is lost only after the taxes are paid. *See id.* This reasoning is quite inconsistent with the importance which *Vinick II* places upon who makes the decisions concerning payment of taxes.